IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR SECURITY BANK OF BIBB COUNTY, | ) ) ) | Civil Action File No.: |
| | ) | 5:13-CV-347 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| ALFORD C. BRIDGES; WILLIAM P. BROOKS, M.D.; RICHARD A. COLLINSWORTH; DANIEL FORRESTER; FRANK D. GUNN; MELVILLE A. JAMISON, III; ROBERT T. MULLIS; BRENDA HOPPER, as EXECUTRIX of THE ESTATE OF BENJAMIN G. PORTER, JR., DECEASED; JOHN W. RAMSEY; ALVIN D. SEWELL, M.D.; CHRIS R. SHERIDAN, JR.; GEORGIA SLAGLE; JOE E. TIMBERLAKE, III; H. AVERETT WALKER; FRANK G. WALL, JR; and RICHARD W. WHITE, JR., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT**

Plaintiff the Federal Deposit Insurance Corporation as Receiver for Security Bank of Bibb County (hereinafter referred to as "Plaintiff" or the "FDIC-R"), states its complaint against the Defendants, and each of them, as follows:

## I.   INTRODUCTION

### 1.

The FDIC-R brings this action in its receivership capacity against certain former directors and officers of Security Bank of Bibb County.

### 2.

On July 24, 2009, Security Bank of Bibb County was closed by the Georgia Department of Banking & Finance ("GDBF").

### 3.

The loss to the Deposit Insurance Fund is currently estimated to be $358.9 million.

### 4.

The FDIC-R, as Receiver for Security Bank of Bibb County, brings this action to recover no less than $21.764 million in damages caused by Defendants' negligence, gross negligence and breaches of legal duties.

### 5.

The $21.764 million damage claim is based on losses from the acts and omissions of the Defendants with regard to seven (7) commercial real estate ("CRE") and acquisition, development and construction ("ADC") loans, and three (3) lines of credit (the "LOCs") that were improperly approved by Defendants from

August 11, 2005 through April 24, 2008 (collectively, the "Losses").

6.

In gross derogation of their duty to engage in safe and sound banking practices, Defendants engaged in negligent and grossly negligent conduct. Such acts and omissions include, without limitation: the improper approval of millions in loans to borrowers, including Security Bank of Bibb County's officers and directors, often at preferential terms or with preferential administration; the acceptance of loan participations from affiliated banks and entities without conducting proper due diligence regarding the subject loans; and the approval of loans which violated Security Bank of Bibb County's loan policy (the "Loan Policy") and applicable Federal and state regulations.

7.

These negligent and grossly negligent acts and omissions of Defendants were the direct and proximate cause of the Losses the FDIC-R now seeks to recover.

8.

In this lawsuit, the FDIC-R seeks to collect damages flowing from Defendants' negligence and gross negligence.

## II.   JURISDICTION AND VENUE

9.

This Court has subject matter jurisdiction of this matter because actions in which the Federal Deposit Insurance Company is a party are deemed to arise under federal law pursuant to 12 U.S.C. § 1811, et seq.; 12 U.S.C. § 1819(b)(1) and (2); and 28 U.S.C. §§ 1331 and 1345.  The Federal Deposit Insurance Company has the power to bring suit in any court of law. 12 U.S.C. § 1819.

10.

This Court has personal jurisdiction over the Defendants who at all relevant times were residents of, and conducted Security Bank of Bibb County's business in, the State of Georgia.

11.

Venue is proper in this district under 28 U.S.C. § 1391(b) as one or more Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of property that is the subject of the action is situated in, this district.

### III. THE PARTIES

12.

The Federal Deposit Insurance Corporation is a corporation organized and existing under the laws of the United States of America[1] with its principal place of business in the District of Columbia.  12 U.S.C. § 1811, *et seq.*

13.

On July 24, 2009, FDIC-R was appointed as the Receiver of Security Bank of Bibb County pursuant to 12 U.S.C. § 1821(c).

14.

Pursuant to 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), FDIC-R succeeded to all rights, titles, powers, and privileges of Security Bank of Bibb County and its shareholders, account holders, depositors and creditors, including, but not limited to, claims against Security Bank of Bibb County's former directors and officers.

---

[1]    The Federal Deposit Insurance Corporation has several different responsibilities, including without limitation, the corporate responsibility as deposit insurer to resolve failed federally insured depository institutions through oversight of the resulting receiverships established and functioning through the Division of Resolutions and Receiverships. This corporate arm of the Federal Deposit Insurance Corporation is hereinafter referred to as "FDIC-C". FDIC-C and FDIC-R are functionally and legally separate.

15.

FDIC-R is tasked, under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, with bringing claims to recover losses suffered by the Deposit Insurance Fund and a bank's depositors, creditors, and shareholders. <u>See</u> 12 U.S.C. §§ 1821(d)(2)(A)(i) & (d)(10)-(11); § 1823(d)(3)(A). The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 specifically authorizes suits by FDIC-R against the failed institution's officers and directors. <u>See</u> 12 U.S.C. §§ 1821(k).

16.

Defendant Richard A. Collinsworth ("Collinsworth") was Security Bank of Bibb County's President from 1996 until January 30, 2007. Collinsworth was a member of Security Bank of Bibb County's Board of Directors (the "Board") and Directors Loan Committee (the "DLC") from 1996 until Security Bank of Bibb County failed on July 24, 2009. Collinsworth was also a member of the Officers Review Committee ("ORC") from January, 2005 until the bank's failure. Collinsworth is a resident of the State of Georgia residing in Macon, Georgia.

17.

Defendant Daniel Forrester ("Forrester") was Security Bank of Bibb County's President from January 30, 2007 until January 28, 2008. Forrester was a member of the Board, DLC and ORC from

January 30, 2007 until Security Bank of Bibb County failed on July 24, 2009.  Forrester is a resident of the State of Georgia residing in Macon, Georgia.

18.

Defendant Melville A. Jamison, III ("Jamison") was Security Bank of Bibb County's President from January 28, 2008 until Security Bank of Bibb County failed on July 24, 2009.  Jamison was a member of the Board and DLC from January 28, 2008 until Security Bank of Bibb County failed on July 24, 2009.  Jamison is a resident of the State of Georgia residing in Macon, Georgia.

19.

Defendant Alford C. Bridges ("Bridges") was a member of the Board and DLC from 1987 until Security Bank of Bibb County failed on July 24, 2009.  Bridges is a resident of the State of Georgia residing in Gray, Georgia.

20.

Defendant William P. Brooks, M.D. ("Brooks") was a member of the Board and DLC from 1987 until Security Bank of Bibb County failed on July 24, 2009. Brooks is a resident of the State of Georgia residing in Macon, Georgia.

21.

Defendant Frank D. Gunn ("Gunn") was a member of the Board and DLC from December 20, 2005 until Security Bank of Bibb County failed on July 24, 2009.   Gunn was a resident of the State of Georgia from December 20, 2005 until at least July 24, 2009 and currently resides in Fernandina Beach, Florida.

22.

Defendant Robert T. Mullis ("Mullis") was a member of the Board and DLC from 1987 until Security Bank of Bibb County failed on July 24, 2009. Mullis is a resident of the State of Georgia residing in Macon, Georgia.

23.

Defendant Benjamin G. Porter, Jr. ("Porter") was a member of Security Bank of Bibb County's Board from 1986 until Security Bank of Bibb County failed on July 24, 2009.  Porter is deceased as of September 30, 2010 and Brenda Hopper ("Hopper") has been appointed as the Executor of Porter's Estate (the "Estate"). Hopper is a resident of Warner Robbins, Georgia for purposes of claims against Porter's Estate.

24.

Defendant John W. Ramsey ("Ramsey") was a member of the Board and DLC from 2000 until Security Bank of Bibb County

failed on July 24, 2009.  Ramsey is a resident of the State of Georgia residing in Macon, Georgia.

25.

Defendant Alvin D. Sewell, M.D. ("Sewell") was a member of the Board from 2002 until he resigned on April 21, 2009.  Sewell is a resident of the State of Georgia residing in Macon, Georgia.

26.

Defendant Chris R. Sheridan, Jr. ("Sheridan") was a member of the Board and DLC from 1996 until Security Bank of Bibb County failed on July 24, 2009.  Sheridan is a resident of the State of Georgia residing in Macon, Georgia.

27.

Defendant Georgia Slagle ("Slagle") was a member of the Board from July 2006 until Security Bank of Bibb County failed on July 24, 2009.  Slagle is a resident of the State of Georgia residing in Macon, Georgia.

28.

Defendant Joe E. Timberlake, III ("Timberlake") was a member of the Board and DLC from 1996 until Security Bank of Bibb County failed on July 24, 2009.  Timberlake is a resident of the State of Georgia residing in Macon, Georgia.

29.

Defendant H. Averett Walker ("Walker") was a member of the Board and DLC from 1996 until he resigned on September 19, 2008. Walker is a resident of the State of Georgia residing in Macon, Georgia.

30.

Defendant Frank G. Wall, Jr. ("Wall") was a member of the Board and DLC from 1987 until Security Bank of Bibb County failed on July 24, 2009. Wall is a resident of the State of Georgia residing in Irwington, Georgia.

31.

Defendant Richard W. White, Jr. ("White") was Chairman of the Board and a member of the DLC from 1987 until Security Bank of Bibb County failed on July 24, 2009. White is a resident of the State of Georgia residing in Macon, Georgia.

**IV.   FACTUAL BACKGROUND**

**History of Security Bank of Bibb County**

32.

Security Bank of Bibb County was wholly owned by Security Bank Corporation ("SBKC"). Security Bank of Bibb County was founded in 1987 and opened for business on November 4, 1988 as Security National Bank of Macon.

33.

Security Bank of Bibb County was formerly known as Security National Bank of Macon and was a federally chartered bank supervised by the Office of the Comptroller of the Currency.

34.

On March 1, 1994, when SBKC was formed, Security National Bank of Macon became a Georgia charted nonmember bank and changed its name to Security Bank of Bibb County.

35.

Between 1999 and 2006, SBKC acquired five additional banks which eventually became known as Security Bank of Houston County, Security Bank of Jones County, Security Bank of North Metro, Security Bank of North Fulton and Security Bank of Gwinnett County (collectively, with Security Bank of Bibb County, the "Security Bank Entities").

36.

SBKC established aggressive growth goals for the Security Bank Entities.

37.

On June 29, 2000, the GDBF approved Security Bank of Bibb County's acquisition of Fairfield Financial Services, Inc. ("Fairfield"), a mortgage loan originator, which became a wholly owned subsidiary of Security Bank of Bibb County.

38.

On July 15, 2008, Fairfield changed its name to Security Real Estate Services, Inc. ("SRES") and did business under the name Security Mortgage.

**Security Bank of Bibb County's
Loan Approval Authorities and Loan Policy**

39.

Members of the DLC included members of the Board and senior-level executive officers of Security Bank of Bibb County.

40.

The DLC was responsible for establishing individual secured and unsecured lending limits for each officer of Security Bank of Bibb County in whom lending authority was vested.

41.

The DLC was also responsible for ensuring that Security Bank of Bibb County's lending policies were being observed and that loans made were consistent with all state and federal regulations, statutes and guidelines.

42.

The DLC was charged with reviewing the lending activities of Security Bank of Bibb County and with approving loans of at least $3.0 million, based on the total amount of loans to a

single borrower and any affiliated parties, up to Security Bank of Bibb County's legal lending limits.

43.

The DLC was the primary safeguard for ensuring that the Loan Policy was followed and proper procedures were maintained.

44.

Among other things, the Board reviewed actions taken by the DLC.

45.

The Board also reserved to itself authority to act on all loans to Security Bank of Bibb County's directors and officers as well as the directors of the other Security Bank Entities.

46.

Absent express approval of an exception as provided by the Loan Policy, both the DLC and Board were to approve all loans in accordance with the Loan Policy.

47.

Pertinent provisions of the Loan Policy, in effect during the relevant time period, provide that:

    a.    Borrowers and guarantors were required to provide current financial information and tax returns for each new loan and renewal.

    b.    An analysis was required of each borrower's and guarantor's financial information to determine if they could repay the loan.

    c.    The ratio of available cash to debt service was required to be at least 1.00.

    d.    The maximum loan-to-value ("LTV") ratio allowed for a loan was 65% for a raw land loan and 75% for a land development and commercial property loan based on the lower of cost or appraised value.

    e.    Securities taken as collateral were to be readily marketable.

    f.    An analysis was to be made for each loan to determine feasibility, plans for repayment, timeframes for project completion, and assurance that sufficient liquid funds were available from the project or the guarantors to pay the loan.

## Regulatory History and
## Defendants' Lack of Response to Regulatory Criticisms

48.

Beginning in 2005, the Georgia Department of Banking and Finance (the "GDBF") and, in 2006, FDIC-C, consistently identified Security Bank of Bibb County's increasing risk in its loan portfolio resulting from its concentration in ADC and CRE loans.

49.

The GDBF and FDIC-C cautioned Security Bank of Bibb County that the concentration in ADC and CRE loans warranted continued monitoring by Security Bank of Bibb County management.

50.

In the December 2005 Federal Reserve Report which was delivered to SBKC BOD on February 7, 2006, concerns regarding

"aggressive growth strategy" and "CRE concentrations" were noted throughout.  Defendants had knowledge of these facts on or about February 7, 2006.

51.

Further, various investment reports regarding SBKC stock, including without limitation a report completed in June 2006, by *Sandler O'Neil Partners Investment Research* contained "Noted Risk Factors" similar to the following:

> Investment risks include a significant slowdown in construction lending activity in the bank's middle Georgia and metro Atlanta markets, unforeseen deterioration in credit quality; the undertaking of dilutive acquisitions, greater than expected net interest margin compression from a sudden shift in interest rates and a general retreat in the value of bank equities.

Defendants had knowledge of these facts on or about June 2006.

52.

In FDIC-C's 2006 Report of Examination ("RoE") and GDBF's 2007 RoE, FDIC-C and GDBF also noted an increase in adversely classified and nonperforming loans at Security Bank of Bibb County.

53.

Further, by the summer of 2006, a significant decline in construction occurred, and an imminent burst in the housing

market bubble was predicted by various economists. By August 2006, the Bloomberg United States Home Building Index, which tracks 20 publicly traded stocks, was down 30% for the year. The Defendants knew, or should have known through the exercise of even the slightest diligence, of this significant decline in the housing market.

54.

Despite the foregoing, and the fact that the Defendants knew, or should have known through the exercise of even the slightest diligence, of the undue risks associated with Security Bank of Bibb County's existing portfolio, the Defendants continued their pattern of negligent and grossly negligent lending practices.

55.

For example, as of March 31, 2007, ADC loans were 487% of Security Bank of Bibb County's Tier I capital,[2] compared to 137% for banks in Security Bank of Bibb County's peer group.

_____

[2] Core capital elements (Tier 1) consists of: (i) common stockholders' equity capital (includes common stock and related surplus, undivided profits, disclosed capital reserves that represent a segregation of undivided profits, and foreign currency translation adjustments, less net unrealized holding losses on available-for-sale equity securities with readily determinable fair values); (ii) noncumulative perpetual preferred stock, including any related surplus; and (iii) minority interests in the equity capital accounts of consolidated subsidiaries.

56.

Despite the fact that the Defendants had actual knowledge of the declining real estate market in Georgia and Florida, they continued their pattern of negligent and grossly negligent lending practices.

57.

In its March 2008 RoE (delivered on December 19, 2008), the FDIC-C concluded that Security Bank of Bibb County's condition had worsened substantially from the prior year and double-downgraded Security Bank of Bibb County to a composite CAMELS 4 rating.[3]

58.

The FDIC-C cited Security Bank of Bibb County's continued failure to correct previously identified underwriting and credit administration weaknesses, a marked increase in problem assets, critically deficient earnings, and capital levels insufficient to support the level of risk as reasons for the double-downgraded composite CAMELS 4 rating.

---

[3] Under the Uniform Financial Institutions Rating System, financial institutions are assigned a composite rating based on an evaluation and rating of six essential components of an institution's financial condition and operations. The six component areas are Capital adequacy, Asset quality, Management, Earnings, Liquidity and Sensitivity to market risk. The rating system is referred to as "CAMELS" and is measured on a scale of 1 (strongest) to 5 (weakest).

59.

Defendants failed to implement requisite changes and on July 24, 2009, Security Bank of Bibb County failed.

**The Defendants' Conduct and the Losses**

Approval of the Loans to Goodby's Creek, LLC

60.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from underwriting and credit administration practices associated with two loan transactions between Security Bank of Bibb County and Goodby's Creek, LLC.

61.

The first such loan transaction, approved by all Defendants except Gunnat the August 11, 2005 DLC Meeting, was a $5.729 million ADC loan to Goodby's Creek, LLC (hereinafter referred to as "Goodby's Creek Loan 8100175"), of which a $3.0 million participation was sold to Security Bank of North Fulton and $2.729 million was retained by Security Bank of Bibb County.

62.

The stated purpose of Goodby's Creek Loan 8100175 was to fund the land development of a parcel designated as Phase II of a condominium project in Jacksonville, Florida known as The Cove at St. Johns ("The Cove Project").

63.

The second loan transaction to Goodby's Creek, LLC also approved by all Defendants except Gunn at the August 11, 2005 DLC Meeting, was a $1.375 million second mortgage to be used for the construction of 38 condominium units in Phase I of The Cove Project (hereinafter referred to as "Goodby's Creek Loan 8100176", together with 8100175, the "Goodby's Creek Loans").

64.

The Defendants who approved Goodby's Creek Loans 8100175 and 8100176 did so notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

    a.   the Defendants failed to obtain the number of votes from outside directors required under the Loan Policy to approve either loan;

    b.   the Defendants failed to obtain sufficient evidence that Goodby's Creek, LLC had earnings and cash flow to support the debt;

    c.   the Defendants failed to obtain a feasibility study (as defined and required under the Loan Policy) for The Cove Project ;

    d.   the Defendants did not properly verify the financial statements provided by Goodby's Creek, LLC, which statements failed to adequately reflect its financial condition;

    e.   the Defendants did not properly verify the appraisals, which were inadequate to support the debt;

f.   the Defendants approved loans where the collateral was
     outside of Security Bank of Bibb County's designated
     service area; and

g.   the Defendants approved these loans even though the LTV
     ratio was greater than the amount permitted under the
     Loan Policy and constituted a noted exception to 12
     C.F.R. § 208 (Federal Reserve Regulation H).

65.

On July 19, 2007, all Defendants in attendance at the DLC

Meeting approved the renewal of the Goodby's Creek Loans

notwithstanding the existence of serious loan administration

irregularities and apparent underwriting deficiencies including,

without limitation, the following:

a.   the Defendants did not demand, or require payment of,
     the requisite principal and interest reduction;

b.   the Defendants approved the renewal of the loans twenty-
     four (24) months past origination despite the fact that
     the maximum maturity date approved at origination in
     2005 was eighteen (18) months;

c.   the Defendants did not obtain an updated appraisal
     report for the collateral;

d.   the Defendants did not obtain updated financial
     statements and/or tax returns for Goodby's Creek, LLC;
     and

e.   the Defendants did not obtain updated personal financial
     statements and/or tax returns for the out-of-state
     guarantors.

66.

In April 2007, an incremental increase of $0.5 million to

Goodby's Loan 8100176 was made by the loan officer, unanimously

approved by all Defendants, and resulting in a 36% increase to the loan amount.   This incremental increase was 26% more than the incremental credit authority granted to loan officers under the Loan Policy.   Additionally, this credit increase resulted in a 1% increase of the already unacceptable LTV for this Loss Loan.

67.

The foregoing acts and omissions of the Defendants related to the Goodby's Creek Loans resulted in an aggregate net loss of $4.269 million to Security Bank of Bibb County.

Approval of the Loan to Green Way Developers, Inc.

68.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from a certain loan transaction between Security Bank of Bibb County and Green Way Developers, Inc., that was underwritten by Fairfield.

69.

The loan transaction, unanimously approved by all Defendants at the February 28, 2006 DLC Meeting, was a $9.026 million ADC loan to Green Way Developers, Inc. (the "Green Way Loan").

70.

The stated purpose of The Green Way Loan was to develop Phase I of Village I of the Perry Preserve, a single-family residential community located on approximately 430 acres of land located in Houston County, Georgia ("The Green Way Project").

71.

The Defendants who approved the Green Way Loan did so notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

a.  the Defendants failed to obtain sufficient evidence that Green Way Developers, Inc., had earnings and cash flow to support the relationship debt;

b.  the Defendants approved the loan with turnover of the underlying collateral as the stated primary source of repayment for the loan, despite knowing that The Green Way Project had, as a noted weakness, a lack of lot inventory pre-sales;

c.  the Defendants failed to obtain a feasibility study (as defined and required under the Loan Policy) for The Green Way Project; and

d.  the Defendants did not properly verify the financial statements provided by Green Way Developers, Inc., which failed to adequately reflect its current financial condition, something which the Defendants knew, or had reason to know, was in a precarious state.

72.

Throughout the life of the administration of the Green Way Loan, the Defendants failed to adequately address, correct and/or rectify the existing deficiencies and violations.

73.

At the July 26, 2007 DLC Meeting, all Defendants approved the renewal of the Green Way Loan from its past maturity date of June 10, 2007 for a new maturity date of October 10, 2007, in order to "allow adequate time to underwrite the borrower's request for additional funding".

74.

At the December 29, 2007 DLC Meeting, all Defendants again approved the renewal and extension of the Green Way Loan for another twenty-four (24) months past the original maturity date of October 10, 2007, and increased the Green Way Loan by $777,750.00, for a total commitment of $9.804 million.

75.

The Defendants who renewed, extended, and increased the Green Way Loan did so notwithstanding serious loan administration irregularities and apparent underwriting deficiencies including, without limitation, the following:

    a.   the Defendants did not demand, or require payment of, the requisite principal and interest reduction;

b.   the Defendants did not inspect, or obtain an inspection of, The Green Way Project;

c.   the Defendants did not obtain updated personal financial statements and/or tax returns for the guarantors;

d.   the Defendants did not establish an adequate borrower repayment program; and

e.   the Defendants did not require adequate and proper oversight and monitoring of loan disbursements.

76.

The foregoing acts and omissions of the Defendants related to the Green Way Loan resulted in a net loss of $3.398 million to Security Bank of Bibb County.

Approval of the Loan to 235 Wingate, LLC

77.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from a $16.125 million CRE loan transaction between Fairfield and 235 Wingate, LLC (the "235 Wingate Loan"). Security Bank of Bibb County committed to fund $8.454 million of the 235 Wingate Loan with the remaining balance participated or sold by Fairfield to outside lenders.

78.

The 235 Wingate Loan was approved and ratified by all Defendants except Gunn and Walker at the June 22, 2006 DLC Meeting.

79.

The stated purpose of the 235 Wingate Loan was to fund the purchase of an assemblage of large tracts of undeveloped land in St. John's County, Florida for the purpose of "flipping" the property to a third party for profit within six (6) months.

80.

The Defendants who approved and funded the 235 Wingate Loan did so notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

a.   the Defendants failed to obtain the "one up" approval as defined and required under the Loan Policy[4];

b.   the Defendants failed to obtain sufficient evidence that 235 Wingate, LLC had earnings and cash flow to support the relationship debt;

c.   the Defendants failed to obtain an appraisal from Security Bank of Bibb County's Panel of Approved Appraisers List;

d.   the Defendants did not properly verify the financial statements provided by 235 Wingate, LLC, which were incomplete, inaccurate and/or failed to adequately reflect its financial condition;

e.   the Defendants did not properly verify the financial statements provided by the guarantors, which were incomplete, inaccurate and/or failed to adequately reflect their financial condition;

_____

[4] The "one-up" approval under the Loan Policy required certain loans to be approved by a supervising bank official in the lending officer's line of authority.

f.    the Defendants approved a loan where the collateral was located outside of Security Bank of Bibb County's designated service areas;

g.    the Defendants approved the loan even though the LTV and/or LTC ratio for the 235 Wingate Loan was greater than the amount permitted by the Loan Policy;

h.    the Defendants failed to obtain a feasibility study (as defined and required under the Loan Policy) for the proposed retention and development of the collateral; and

i.    the Defendants failed to conduct an independent credit analysis of the 235 Wingate Loan as part of the participation by Security Bank of Bibb County in the 235 Wingate Loan.

81.

Shortly after the 235 Wingate Loan closed, 235 Wingate, LLC's "hard contract" with the third party "fell through" and although the original term of the 235 Wingate Loan was six (6) months, it was renewed for ninety (90) days in January 2007 and renewed again and extended for twenty-four (24) months in April 2007 while the borrower "considered alternative exit strategies".

82.

Numerous renewals and extensions of the 235 Wingate Loan were approved or ratified by the Defendants notwithstanding serious loan administration irregularities and apparent underwriting deficiencies including, without limitation, the following:

a.    the Defendants did not demand, or require payment of, the requisite principal and interest reduction;

b.    the Defendants did not obtain updated appraisal reports from a bank approved appraiser;

c.    the Defendants did not obtain updated financial statements and/or tax returns for 235 Wingate, LLC;

d.    the Defendants did not obtain updated personal financial statements and/or tax returns for the guarantors;

e.    the Defendants renewed the 235 Wingate Loan despite a questionable Credit Grade for 235 Wingate, LLC, and obvious lack of earnings and cash flow to support the debt;

f.    the Defendants did not obtain updated collateral information; and

g.    the Defendants did not request nor require 235 Wingate, LLC, and/or the guarantors to pledge any additional collateral to secure the 235 Wingate Loan.

83.

The foregoing acts and omissions of the Defendants with regard to the 235 Wingate Loan resulted in an aggregate net loss of $3.25 million to Security Bank of Bibb County.

Approval of the Loan to Nine Mile, LLC

84.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from a $22.950 million loan refinance transaction involving Nine Mile, LLC, of which $.250 million was participated out to, and funded by, Security Bank of Bibb County (the "Nine Mile Transaction").

85.

Nine Mile, LLC, a Florida limited liability company, was organized for the purpose of holding title to 398+ acre tract of land in St. John's County, Florida consisting of 159.9 "developable" acres otherwise known as the World Golf Village Site (the "Nine Mile Project").

86.

The Nine Mile Transaction was approved and ratified unanimously by all Defendants at the July 19, 2007 DLC Meeting.

87.

The purpose of the Nine Mile Transaction was to (a) refinance the outstanding $16.212 million ADC loan made to Nine Mile, LLC on March 21, 2005 by Fairfield, (b) consolidate the $16.212 million ADC loan with a second related ADC loan made to the borrower's guarantors and affiliate, Deerwood Lakes, LLC, and (c) fund the development of the Nine Mile Project.

88.

The Defendants who approved and funded the Nine Mile Transaction did so notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

   a.   the Defendants failed to obtain sufficient evidence that
        Nine Mile, LLC had the earnings and cash flow to support
        the relationship debt;

b.    the Defendants did not properly verify the financial statements provided by Nine Mile, LLC, which were incomplete, inaccurate and/or failed to adequately reflect its financial condition;

c.    the Defendants did not properly verify the financial statements provided by the guarantors, which were incomplete, inaccurate and/or failed to adequately reflect their financial condition;

d.    the Defendants approved the Nine Mile Transaction even though the collateral was outside of Security Bank of Bibb County's designated service area;

e.    the Defendants approved the loan even though the LTV and/or LTC ratio for the Nine Mile Transaction was greater than the amount permitted by the Loan Policy;

f.    the Defendants did not demand, or require payment of, the required principal and interest from Nine Mile, LLC;

g.    the Defendants did not demand, or require, cash equity contributions from either Nine Mile, LLC or the guarantors; and

h.    the Defendants did not inspect, or obtain an inspection report, regarding the collateral and/or the Nine Mile Project.

89.

The foregoing acts and omissions of the Defendants with regard to the Nine Mile Transaction resulted in an aggregate net loss of $.120 million to Security Bank of Bibb County.

## The Insider Transactions

90.

In order for Security Bank of Bibb County to make loans to its officers or members of the Board, a majority approval vote of the non-interested Board members was required.

91.

In order for Security Bank of Bibb County to make loans to the directors, officers and shareholders of SBKC or the other Security Bank Entities, a majority approval vote of the non-interested Board members was required.

92.

Additionally, 12 C.F.R. § 215 (Federal Reserve Regulation O) and O.C.G.A. § 7-1-491 prohibited Defendants from, among other things, extending financing to any bank directors or policy-making officers on terms, rates, and conditions that are considered "preferential" (as defined therein).

93.

As of April 30, 2009, Security Bank of Bibb County had made $45.2 million in loans to its directors and officers as well as the directors of the other Security Bank Entities (the "Insider Transactions").

94.

Four of the debt relationships resulting from the Insider Transactions resulted in $10.762 million in Losses to Security Bank of Bibb County.   These debt relationships are described below.

95.

The Board voted to approve all of the Insider Transactions described below with no dissenting votes.

Approval of the Mullis Insider Transactions

96.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from an Insider Transaction approved by Bridges, Brooks, Collinsworth, Gunn, Ramsey, Sewell, Sheridan, Timberlake, Walker, Wall and White  at the June 21, 2005 Board Meeting, except Mullis, involving a $5.0 million guidance LOC to Mullis, a Director of SBKC and Security Bank of Bibb County, and his business associate, Michael C. Griffin. (the "Mullis LOC").  Shortly thereafter,  at the March 16, 2006 DLC Meeting, all of the Defendants (with Mullis recusing) approved an increase of the Mullis LOC to $10 million, thus providing Mullis with access to up to $10 million in credit from Security Bank of Bibb County. This action was reviewed and approved by all Defendants, with exception to Porter who was

absent, at the March 21, 2006 Board Meeting (with Mullis recusing).

97.

The stated purpose for establishment of the Mullis LOC was to fund Mullis' speculative real estate investments, or "[the] purchases of unimproved land or other real estate, presently unidentified, that will be held for resale or future development". The primary source of repayment of the draws under the Mullis LOC was to come from the sale of the "presently unidentified" property purchased with the funds available under the Mullis LOC.

98.

The Mullis LOC was quickly advanced through the funding of a number of personal loans to Mullis, several joint loan transactions with Mullis and his business associate, Michael C. Griffin ("Griffin"), and Mullis' guaranty of a loan to his sister-in-law, Cynthia Mullis, which Security Bank of Bibb County treated as part of the overall relationship exposure. There were seven (7) such loan transactions which appear to have been funded by the Mullis LOC (collectively, the "Mullis Insider Transactions").

99.

The Defendants who approved and funded the Mullis LOC and Insider Transactions did so notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following which applied to some, or all, of the Mullis LOC and Insider Transactions:

a.   the Defendants used analytical procedures and approval methods for the Mullis LOC and Insider Transactions that demonstrated preferential treatment of Mullis, or a violation of Federal Reserve Regulation O and/or O.C.G.A. § 7-1-491;

b.   the Defendants failed to obtain the "one up" approvals as defined and required under the Loan Policy;

c.   the Defendants failed to obtain sufficient evidence that the borrower(s) and/or guarantor(s) had earnings and cash flow to support the relationship debt;

d.   the Defendants did not properly verify the personal financial statements or tax returns of Mullis and extended credit absent adequate review or analysis;

e.   the Defendants did not properly verify the financial statements provided by the borrower(s) and/or guarantor(s), which were incomplete, inaccurate and/or failed to adequately reflect their financial condition, something which the Defendants knew, or had reason to know, was in a precarious state;

f.   the Defendants approved Mullis Insider Transactions for which the collateral was located outside of Security Bank of Bibb County's designated service area; and

g.   the Defendants approved Mullis Insider Transactions for which the LTV and/or LTC ratio was greater than the amount permitted under the Loan Policy.

100.

The Defendants who renewed and extended the Mullis LOC and Insider Transactions did so notwithstanding serious loan administration irregularities and apparent underwriting deficiencies surrounding some, or all, of the Mullis LOC and Insider Transactions including, without limitation, the following:

a.    the Defendants extended the term of the loan beyond the approved maturity date, with no demand, or payment, of the required principal and interest reduction;

b.    the Defendants failed to obtain updated appraisal reports for the collateral securing the Mullis Insider Transactions;

c.    the Defendants failed to obtain updated financial statements and/or tax returns for the borrower(s);

d.    the Defendants failed to obtain updated personal financial statements and/or tax returns for the guarantor(s);

e.    the Defendants extended, and renewed, credit despite the questionable Credit Grade for borrower(s), signs of strain in the existing lending relationship, and obvious lack of earnings and cash flow to support the relationship debt;

f.    the Defendants did not obtain collateral inspections and/or failed to update collateral information;

g.    the Defendants did not request, nor require, the borrower(s) and/or guarantor(s) to pledge any additional collateral to secure the Mullis Insider Transactions; and

h.    the Defendants' renewal of the Mullis Insider Transactions reflected a failure to adhere to the

policies concerning non-accrual status of the loans and/or reporting same in accordance with the Loan Policy, demonstrating further preferential treatment of Mullis proscribed by Federal Reserve Regulation O and/or O.C.G.A. § 7-1-491.

101.

The foregoing acts and omissions of the Defendants with regard to the Mullis LOC and Insider Transactions resulted in an aggregate net loss of $2.4 million to Security Bank of Bibb County.

Approval of the Smith Insider Transactions

**The Relationship with
Brantley Land and Timber, LLC**

102.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from an Insider Transaction approved by all of the Defendants except Jamison, Porter and Ramsey, at the March 20, 2007 Board Meeting, involving a $10 million loan made by Security Bank of North Fulton to Brantley Land & Timber, LLC ("Brantley Land"), of which $5.570 million of the total loan amount was participated out to, and funded by, Security Bank of Bibb County (the "Brantley Loan").

103.

One of the principals of Brantley Land, and guarantor of the Brantley Loan, was Victor C. Smith, a Director of Security Bank of North Fulton.

104.

The stated purpose for funding the Brantley Loan was to refinance Brantley Land's debt with Prime South Bank ($4.5 million), complete development of an unimproved lot development project in Brantley County, Georgia ($1.5 million); and to enable the principals of Brantley Land to cash out their equity in the project (at least $4.0 million).

105.

The collateral securing the Brantley Loan was an assignment of the notes and security deeds pertaining to 918 lots allegedly sold to third party investors, which purported to result in $17.0 million in mortgages. Security Bank of North Fulton had a security interest on the remaining 285 unsold lots, but it failed to obtain a first priority security interest on the entire project and/or the 1,994 acres of which Brantley Land was the title owner.

106.

Notably, the Request for Approval form submitted by loan officer Joseph Ross Mynatt ("Mynatt")[5] and approved by the Defendants contained a mathematical error of at least $8.4 million on account of the fact that the sold residential lots were valued twice (as an "Assignment of Mortgages" and an "Assignment of Deeds"), resulting in a significantly skewed and overly inflated LTV and/or LTC ratio, and grossly overvalued collateral.

107.

The primary source of repayment of the Brantley Loan was to come from the sale and financing of the remaining 285 unsold lots by Brantley Land to third party investors.

108.

The Defendants who approved and funded the Brantley Loan did so without conducting the independent underwriting analysis required by the Loan Policy, and instead relied on the underwriting performed by Security Bank of North Fulton.

---

[5]    In February 2007, at the time the Request for Approval form for the Brantley Loan was prepared and submitted to the Board, Mynatt was the Senior Commercial Lending Officer of Security Bank of North Fulton.  Effective March 1, 2007, Mynatt was promoted to President of Security Bank of North Metro, the other Security Bank Entity that purchased the balance of the $10 million Brantley Loan.

109.

Consequently, the Brantley Loan was approved and funded by the Defendants notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

a.   the Defendants failed to obtain sufficient evidence that Brantley Land and/or the guarantors had earnings and cash flow to support the relationship debt;

b.   the Defendants knew or should have known that there was no sound banking reason to justify the $6.68 million cash out to the borrower and principals that the Brantley Loan provided;

c.   the Defendants knew or should have known that the analytical procedures and approval methods for the Brantley Loan undertaken by Security Bank of North Fulton demonstrated preferential treatment of the borrower, or a violation of Federal Reserve Regulation O and/or O.C.G.A. § 7-1-491;

d.   the Defendants did not properly verify the financial statements provided by Brantley Land and/or the guarantors, which were incomplete, inaccurate and/or failed to adequately reflect their financial condition;

e.   the Defendants did not properly verify the appraisal, which was inadequate to support the debt and/or incomplete;

f.   the Defendants failed to obtain an appraisal from Security Bank of Bibb County's Panel of Approved Appraisers List;

g.   the Defendants approved the loan even though the LTV and/or LTC ratio was significantly greater than the amount permitted under the Loan Policy;

h. the Defendants failed to conduct an independent credit analysis as part of the participation by Security Bank of Bibb County in the Brantley Loan;

i. the Defendant failed to require that all of the contingencies to approval set by the ORC on February 27, 2007 were met prior to funding, resulting in the waiver of these contingencies; and

j. the Defendants failed to review, analyze or verify that there was sufficient evidence concerning the ability of the third party investors to pay on the notes or that the Brantley Loan was sufficiently collateralized.

110.

These deficiencies and violations would have been discovered by the Defendants if proper, independent underwriting had been conducted.

111.

Subsequent to the funding of the Brantley Loan, Brantley Land sold only seven (7) more lots in the project.

112.

Further, the Defendants knew, or should have known, of the existence of serious loan administration and collateral maintenance irregularities and deficiencies related to the Brantley Loan resulting from the insider relationship with Victor C. Smith, and the preferential treatment received by Brantley Land as a result, including without limitation the following:

a.   the Defendants failed to sufficiently monitor the loan disbursements;

b.   the Defendants failed to require that the collateral documentation be maintained and/or updated;

c.   the Defendants failed to establish funding contingencies;

d.   the Defendants failed to enforce the loan covenants; and

e.   the Defendants allowed the borrowers to control the payments received from alleged mortgages.

113.

Further, the Defendants knew, or should have known, that Security Bank of North Fulton was not properly monitoring and administering the Brantley Loan.

114.

The foregoing acts and omissions of the Defendants with regard to the Brantley Loan resulted in an aggregate net loss of $2.58 million to Security Bank of Bibb County.

**The Relationship with C&R Financial Lenders, LLC**

115.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from  an Insider Transaction approved unanimously by all of the Defendants at the February 19, 2008 Board Meeting, involving a $3 million LOC offered by Security Bank of North Fulton to C&R Financial Lenders, LLC, ("C&R") of which $.5 million of the total amount advanced was

participated out to, and funded by, Security Bank of Bibb County
(the "C&R LOC").

116.

One of the principals of C&R, and guarantor of the C&R LOC,
was Victor C. Smith, a Director of Security Bank of North
Fulton.

117.

The stated purpose for the C&R LOC was to fund short-term
loans to metropolitan Atlanta residential real estate investors.
The collateral securing the C&R LOC was an assignment of the
third party promissory notes and first priority security deeds
pertaining to various properties purchased such investors that
supported the notes receivables to C&R.

118.

Advances made under the C&R LOC always exceeded the
purchase price of the property that purported to support the
note receivable because monies were advanced to cover all
closing costs related to the investor "flip," as well as the
estimated costs for necessary repairs and renovations to the
properties.

119.

The Security Bank of North Fulton renewed the C&R LOC no
less than six (6) times, the last renewal occurring in December

2007, a few months prior to the participation purchase by Security Bank of Bibb County.

120.

Serious loan administration and collateral maintenance irregularities and deficiencies were noted with the C&R LOC prior to the participation of Security Bank of Bibb County, including the fact that monies reserved for necessary repairs and renovation were apparently misdirected by the principals of C&R.

121.

Further, the Defendants knew, or should have known, prior to approval of the C&R LOC of the existence of numerous loan administration issues resulting from the insider relationship with Victor C. Smith, and the preferential treatment received by C&R as a result, including without limitation, the following:

    a.    that the loan disbursements were not sufficiently monitored;

    b.    that the collateral documentation was not maintained and/or updated;

    c.    that disbursement contingencies were not established; and

    d.    that the loan covenants were not enforced.

122.

These deficiencies and violations continued after the funding of the C&R LOC by the participation of Security Bank of Bibb County, and were either known, or should have been known, by the Defendants.

123.

The Defendants who approved and funded the C&R LOC did so without conducting the independent underwriting analysis required by the Loan Policy, and instead relied on the underwriting performed by Security Bank of North Fulton.

124.

Consequently, the C&R LOC was approved and funded by the Defendants notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

   a.   the Defendants failed to obtain sufficient evidence that C&R and/or the guarantors had earnings and cash flow to support the relationship debt;

   b.   the Defendants knew or should have known that the analytical procedures and approval methods for the C&R LOC undertaken by Security Bank of North Fulton demonstrated preferential treatment of the borrower, or a violation of Federal Reserve Regulation O and/or O.C.G.A. § 7-1-491;

   c.   the Defendants did not properly verify the financial statements provided by C&R and/or the guarantors, which the Defendants knew or should have known were

incomplete, inaccurate and/or failed to adequately reflect their financial condition.

d.  the Defendants failed to obtain an appraisal of the collateral properties from Security Bank of Bibb County's panel of approved appraisers list;

e.  the Defendants failed to conduct an independent credit analysis as part of the participation by Security Bank of Bibb County in the C&R LOC;

f.  the Defendants failed to obtain sufficient evidence from either Security Bank of North Fulton, or C&R, concerning the ability of the third party investors to pay on the notes that purported to secure the C&R LOC; and

g.  the Defendants failed to make or obtain visual inspections of the real estate taken as collateral, or conduct subsequent inspections to substantiate repair draws.

125.

These deficiencies and violations would have been discovered by the Defendants if proper, independent underwriting had been conducted.

126.

The foregoing acts and omissions of the Defendants with regard to the C&R LOC resulted in an aggregate net loss of $.430 million to Security Bank of Bibb County.

Approval of the Been Insider Transaction

127.

The Losses suffered as the result of the acts and omissions of the Defendants arise in part from an Insider Transaction

approved by all of the Defendants in attendance at the April 24, 2008 Board Meeting, involving a $9 million revolving LOC offered to Jonathan W. Been ("Been"), a Director of Security Bank of Gwinnett County (the "Been Insider Transaction").

128.

The stated purpose for funding the Been Insider Transaction was to provide short-term liquidity to Been's residential construction company.

129.

As collateral, Been assigned a brokerage account holding 1,883,258 shares of SBKC's stock that Been had purchased a month prior in a March 2008 Rights Offering.  The shares of SBKC's stock were valued by Security Bank of Bibb County at $7.50 per share.

130.

The Defendants approved and funded the Been Insider Transaction notwithstanding numerous, serious loan underwriting deficiencies and Loan Policy violations including, without limitation, the following:

a. the Defendants knew or should have known that the analytical procedures and approval methods for the Been Loan demonstrated preferential treatment of Been, or a violation of Federal Reserve Regulation O and/or O.C.G.A. § 7-1-491;

b.    the Defendants knew or should have known that approval
      from the Board of Security Bank of Gwinnett County was
      not obtained as required under the Loan Policy;

c.    the Defendants knew or should have known that Security
      Bank of Bibb County's valuation of the collateral was
      neither accurate, nor in compliance with 12 C.F.R. § 221
      (Federal Reserve Regulation U);

d.    the Defendants knew or should have known that there was
      insufficient evidence that Been had earnings and cash
      flow to support the debt;

e.    the Defendants failed to properly verify, meaningfully
      review, or analyze Been's personal financial statement;
      and

f.    the Defendants failed to properly verify the financial
      statements provided by Been, which were incomplete,
      inaccurate and/or failed to adequately reflect his true
      financial condition, something which the Defendants
      knew, or had reason to know, was in a precarious state.

131.

Almost immediately after the Been Insider Transaction was
funded and drawn down by Been, the value of the SBKC stock
plummeted, rendering the loan significantly out-of-margin.

132.

It became readily apparent to the Defendants that credit
had been extended to Been based upon inadequate, or wrongly
valued, collateral, or securities, that was not "readily
marketable".

133.

On April 16, 2009, and on May 14, 2009, the DLC approved the renewal of the Been Insider Transaction and, on May 19, 2009, all of the Defendants attending the Board Meeting (Porter being the only Director absent), with exception to Bridges, voted to approve the renewal of the Been Insider Transaction, notwithstanding serious loan administration irregularities, preferential treatment, and apparent underwriting deficiencies including, without limitation, the following:

a.   the Defendants knew or should have known that the analytical procedures and approval methods for renewal of the Been Insider Transaction demonstrated preferential treatment of the borrower;

b.   the Defendants knew or should have known that the term of the out-of-margin loan was extended beyond the approved maturity date, with no demand, or payment, of the required principal and interest reduction despite its LTV ratio of 323%;

c.   the Defendants knew or should have known that the term of the out-of-margin loan was extended, requiring only interest payments for an additional 12 months, rather than amortization of the unsecured portion as required by the Loan Policy;

d.   the Defendants failed to obtain an appraisal of the additional collateral pledged by the borrower (out-of-state property);

e.   the Defendants failed to obtain a collateral inspection of the additional collateral pledged;

f.   the Defendants failed to require, or apparently even request, that Been pledge any additional collateral

and/or collateral located within the State of Georgia, to further secure the Been Insider Transaction; and

g.    the Defendants knew or should have known that credit was extended, and renewed, despite the questionable Credit Grade for Been, signs of strain in the existing lending relationship, and an obvious lack of earnings and cash flow to support the relationship debt.

134.

The foregoing acts and omissions of the Defendants with regard to the Been Insider Transaction resulted in an aggregate net loss of $5.335 million to Security Bank of Bibb County.

**V.    CLAIMS FOR RELIEF**

**Count 1 – Negligence against all Defendants.**

135.

The FDIC-R incorporates by reference each of the allegations in the above paragraphs numbered 1 through 142 as if fully restated herein.

136.

O.C.G.A. § 7-1-490 provides, in relevant part, as follows:

> Directors and officers of a bank or trust company shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like positions.

137.

The Defendants, as directors of Security Bank of Bibb County, were required and had a duty to comply with O.C.G.A. §§

7-1-490, and their failure to do so by negligently approving and funding numerous loan transactions and preferential Insider Transactions as discussed hereinabove unnecessarily exposed Security Bank of Bibb County to undue risk and resulting substantial harm.

138.

As a direct and proximate result of Defendants' negligence and failure to exercise that diligence, care and skill required under O.C.G.A. §§ 7-1-490, Security Bank of Bibb County suffered damages in an amount to be proven at trial, but in no event less than $358.9 million.

## Count 2 – Negligence *Per Se* for violations of Georgia law against all Defendants.

139.

The FDIC-R incorporates by reference each of the allegations in the above paragraphs numbered 1 through 138 as if fully restated herein.

140.

O.C.G.A. § 7-1-490 provides, in relevant part, as follows:

> Directors and officers of a bank or trust company shall discharge the duties of their respective positions in good faith and with that diligence, care, and skill which ordinarily prudent men would exercise under similar circumstances in like positions.

141.

With regard to the Insider Transactions discussed above,
O.C.G.A. § 7-1-491 provides, in relevant part, as follows:

> (...) a bank or trust company shall not make
> loans or otherwise extend financing to any
> one of its directors or policy-making
> officers except on terms, rates, and
> conditions which are not preferential.
> (...) Such loans shall be made only after
> the application of prudent loan underwriting
> criteria normally applied to loan requests
> of a similar nature from applicants who are
> not directors and policy-making officers.

142.

The Defendants, as directors of Security Bank of Bibb
County, were required and had a duty to comply with O.C.G.A. §§
7-1-490 and 7-1-491, and their failure to do so by approving and
funding numerous loan transactions and preferential Insider
Transactions discussed hereinabove, unnecessarily exposed
Security Bank of Bibb County to undue risk and resulting
substantial harm.

143.

O.C.G.A. § 7-1-493 authorizes the filing of a cause of
action against all Defendants, and resulting liability, for
their neglect, failure to perform, management duty violations
and/or negligent disposition or waste of corporate assets.

144.

The Defendants' disregard and total failure to comply with the statutory mandates of O.C.G.A. § 7-1-490 and/or 7-1-491, and numerous breaches of the Defendants' legal duties as directors of the Board of Security Bank of Bibb County, constitutes negligence *per se*, entitling the FDIC-R to damages pursuant to O.C.G.A. § 51-1-6.

145.

As a direct and proximate result of Defendants' negligence *per se*, Security Bank of Bibb County suffered damages in an amount to be proven at trial, but in no event less than $10.762 million.

### Count 3 – Negligence *Per Se* for Violations of Federal Reserve Regulation U against all Defendants.

146.

The FDIC-R incorporates by reference each of the allegations in the above paragraphs numbered 1 through 145 as if fully restated herein.

147.

With regard to the Been Insider Transaction, the Defendants valued the 1,883,258 shares of SBKC stock using a 65% margin, which failed to comply with Federal law and regulations.

Specifically, Section 221.7 of Federal Reserve Regulation U provides in relevant part as follows:

> Supplement: Maximum loan value of margin stock and other collateral. (a) Maximum loan value of margin stock. The maximum loan value of any margin stock is **fifty percent** of its current market value.

12 C.F.R. § 221.7 (emphasis supplied).

148.

The chart below reflects the margin deficiency of the Been Insider Transaction since its inception, and contemporaneous with the draws funded by Security Bank of Bibb County to Been using the 50% Federal Reserve Regulation U:

| Jonathan W. Been LOC | | | | |
|---|---|---|---|---|
| Share of stock: | | **1,883,258** | 50% Margin | Deficiency |
| **Loan Date** | **Loan Funded** | **Stock Price** | | |
| 4/24/08 | $ 2,300,000.00 | $ 7.70 | $ 7,250,543.30 | $ 4,950,543.30 |
| 5/8/08 | $ 4,300,000.00 | $ 6.56 | $ 6,177,086.24 | $ 1,877,086.24 |
| 5/13/08 | $ 6,800,000.00 | $ 6.18 | $ 5,819,267.22 | ($980,732.78) |
| 5/24/08 | $ 6,800,000.00 | $ 5.50 | $ 5,178,959.50 | ($1,621,040.50) |
| 6/24/08 | $ 6,800,000.00 | $ 6.27 | $ 5,904,013.83 | ($895,986.17) |
| 7/24/08 | $ 7,160,000.00 | $ 4.86 | $ 4,576,316.94 | ($2,583,683.06) |
| 8/24/08 | $ 7,160,000.00 | $ 4.09 | $ 3,851,262.61 | ($3,308,737.39) |
| 9/24/08 | $ 7,160,000.00 | $ 4.21 | $ 3,964,258.09 | ($3,195,741.91) |
| 10/24/08 | $ 7,160,000.00 | $ 2.40 | $ 2,259,909.60 | ($4,900,090.40) |
| 11/24/08 | $ 7,160,000.00 | $ 1.28 | $ 1,205,285.12 | ($5,954,714.88) |
| 12/24/08 | $ 7,160,000.00 | $ 1.27 | $ 1,195,868.83 | ($5,964,131.17) |
| 1/24/09 | $ 7,160,000.00 | $ 1.16 | $ 1,092,289.64 | ($6,067,710.36) |
| 2/24/09 | $ 7,163,168.00 | $ 0.46 | $ 433,149.34 | ($6,730,018.66) |
| 3/24/09 | $ 7,163,168.00 | $ 0.39 | $ 367,235.31 | ($6,795,932.69) |
| 4/24/09 | $ 7,163,168.00 | $ 0.58 | $ 546,144.82 | ($6,617,023.18) |
| 5/24/09 | $ 7,163,168.00 | $ 0.52 | $ 489,647.08 | ($6,673,520.92) |
| 6/24/09 | $ 7,142,276.96 | $ 0.40 | $ 376,651.60 | ($6,765,625.36) |
| 7/24/09 | $ 7,142,276.96 | $ 0.24 | $ 225,990.96 | ($6,916,286.00) |

149.

The Defendants were required and had a duty to comply with Federal Reserve Regulation U, and their failure to do so unnecessarily exposed Security Bank of Bibb County to undue risk and resulting substantial harm.

150.

O.C.G.A. § 7-1-493 authorizes the filing of a cause of action against all Defendants, and resulting liability, for

their neglect, failure to perform, management duty violations and/or negligent disposition or waste of corporate assets.

151.

The Defendants disregard and total failure to comply with the restrictions and statutory mandate of Federal Reserve Regulation U with regard to the Been Insider Transaction constitutes negligence *per se*, entitling the FDIC-R to damages pursuant to O.C.G.A. § 51-1-6.

152.

As a direct and proximate result of Defendants' negligence *per se*, Security Bank of Bibb County suffered damages in an amount to be proven at trial, but in no event less than $5.335 million.

**Count 4 – Negligence *Per Se* for Violations of
Federal Reserve Regulation O against all Defendants.**

153.

The FDIC-R incorporates by reference each of the allegations in the above paragraphs numbered 1 through 152 as if fully restated herein.

154.

With regard to the Insider Transactions discussed above, Section 215.4 of Federal Reserve Regulation O which governs any extension of credit made by a member bank to an executive,

officer, director, or principal shareholder of the of the member bank, of any company of which the member bank is a subsidiary, and of any other subsidiary of that company, provides in relevant part as follows:

> (…) No member bank may extend credit to any insider of the bank or insider of its affiliates unless the extension of credit:
>
> (i)    Is made on substantially the same terms (including interest rates and collateral) as, and following credit underwriting procedures that are not less stringent than, those prevailing at the time for comparable transactions by the bank with other persons that are not covered by this part and who are not employed by the bank; and
>
> (ii)   Does not involve more than the normal risk of repayment or present other unfavorable features.

12 C.F.R. § 215.4(a)(1).

155.

The Defendants were required and had a duty to comply with Federal Reserve Regulation O and their failure to do so by approving and funding preferential Insider Transactions such as the Mullis Insider Transactions, the Brantley Loan, the C&R LOC and the Been Insider Transaction discussed hereinabove, unnecessarily exposed Security Bank of Bibb County to undue risk and resulting substantial harm.

156.

O.C.G.A. § 7-1-493 authorizes the filing of a cause of action against all Defendants, and resulting liability, for their neglect, failure to perform, management duty violations and/or negligent disposition or waste of corporate assets.

157.

The Defendants' disregard and total failure to comply with the restrictions, parameters and statutory mandate of Federal Reserve Regulation O with regard to the Insider Transactions constitutes negligence *per se*, entitling the FDIC-R to damages pursuant to O.C.G.A. § 51-1-6.

158.

As a direct and proximate result of Defendants' negligence *per se*, Security Bank of Bibb County suffered damages in an amount to be proven at trial, but in no event less than $10.762 million.

## Count 5 – Gross negligence under Georgia law against all Defendants.

159.

The FDIC-R incorporates by reference each of the allegations in the above paragraphs numbered 1 through 158 as if fully restated herein.

160.

Under Georgia law, Defendants, as directors of Security Bank of Bibb County, each owed Security Bank of Bibb County the duty to exercise the slight diligence that every person of common sense, however inattentive he or she may be, exercises under the same or similar circumstances. Pursuant to O.C.G.A. § 51-1-4, the failure to meet this standard constitutes gross negligence.

161.

Defendants' actions and inaction as described herein demonstrate an absence of the slightest diligence expected from a person with common sense, and instead exhibit such a degree of carelessness and/or inattention to the performance of their duties as a director of Security Bank of Bibb County as to constitute gross negligence under Georgia law.

162.

The Defendants' failure to act with due diligence evidences an abuse of discretion and subjects Defendants to liability.

163.

Examples of Defendants' gross negligence in the discharge of their duties as directors of Security Bank of Bibb County include, but are not limited to:

a.   Defendants failed to adhere to lending policies, applicable requirements, and sound lending practices as described herein, and thus knew or, in the exercise of reasonable diligence, should have known that their practices, and the practices of other Security Bank of Bibb County officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to Security Bank of Bibb County;

b.   Defendants failed to comply with the statutory mandates set forth in state and federal regulations, including without limitation, O.C.G.A. §§ 7-1-490, 7-1-491, Federal Reserve Regulation U and/or Federal Reserve Regulation O (as illustrated in Counts 2, 3, and 4, incorporated herein as if restated).

c.   Contrary to the Loan Policy, and as described more specifically above, high-risk loans were approved by the Defendants and funded based on grossly deficient underwriting practices, and the inaccurate and/or unverified income and credit worthiness of the borrower and/or guarantors;

d.   The Defendants did not perform, or cause Security Bank of Bibb County to perform, independent due diligence or exercise any business judgment with respect to the numerous loan participations originated by Fairfield, SRES or the other Loan Participations, including without limitation the 235 Wingate Loan, the Nine Mile Transaction, the Brantley Loan, and the C&R LOC, and blindly relied on the existing credit analysis provided by Fairfield, SRES or the other Security Bank Entities; and

e.   Despite consistent warnings from the GDBF and FDIC-C, Defendants allowed Security Bank of Bibb County to dramatically increase the high risk associated with ADC and CRE lending by lending and participating in loans for out-of-territory borrowers and projects, including without limitation the Goodby Creek Loans, the 235 Wingate Loan, and the Nine Mile Transaction.

164.

Further, Defendants were aware or, in the exercise of reasonable diligence, should have been aware of significant weaknesses in Security Bank of Bibb County's underwriting practices and procedures as described herein, but failed to address or correct these issues.

165.

In summary, and without limitation, the Defendants, as directors of Security Bank of Bibb County, (a) accepted loan participations from Fairfield, SRES and the other Security Bank Entities without conducting proper due diligence of the loans and without exercising any business judgment, and (b) allowed loans to be approved in violation of Federal regulations, state regulations and the Loan Policy.

166.

As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, Security Bank of Bibb County suffered damage and sustained losses of at least $21.764 million or such other amount as may be proven at trial.

167.

With respect to their grossly negligent actions and
inaction in managing the affairs of Security Bank, Defendants
are jointly and severally liable for all losses.

## Count 6 - Gross negligence under Federal law against all Defendants.

168.

The FDIC-R incorporates by reference each of the
allegations in the above paragraphs numbered 1 through 142 as if
fully restated herein.

169.

Section 1821 (k) of the Financial Institutions Reform,
Recovery, and Enforcement Act of 1989 ("FIRREA") holds directors
or officers of financial institutions personally liable for loss
or damage to the institution caused by their "gross negligence,"
as defined by applicable state law, which in this case is
Georgia law codified at O.C.G.A. § 51-1-4.

170.

Under FIRREA, and the corresponding Georgia standard,
Defendants owed a duty to exercise even the slight diligence
that every person of common sense, however inattentive he or she
may be, exercises under the same or similar circumstances.
O.C.G.A. § 51-1-4.

171.

Defendants' failure to act with due diligence or due care evidences an abuse of discretion and subjects Defendants to liability.

172.

Defendants' actions and inaction as described herein demonstrate an absence of the slightest diligence expected from a person with common sense, but instead exhibits such a degree of carelessness and/or inattention to the performance of their duties as directors so as to constitute gross negligence under FIRREA.

173.

Examples of Defendants' gross negligence in the discharge of their duties as directors of Security Bank of Bibb County include, but are not limited to:

a.   Defendants failed to adhere to lending policies, applicable requirements, and sound lending practices as described herein, and thus knew or, in the exercise of reasonable diligence, should have known that their practices, and the practices of other Security Bank of Bibb County officers and employees over whom they exercised supervisory control were improper, imprudent, and harmful to Security Bank of Bibb County;

b.   Contrary to the Loan Policy, and as described more specifically above, high-risk loans were approved by the Defendants and funded based on grossly deficient underwriting practices, and the inaccurate and/or unverified income and credit worthiness of the borrower and/or guarantors;

c.   The Defendants did not perform, or cause Security Bank of Bibb County to perform, independent due diligence or exercise any business judgment with respect to the numerous loan participations originated by Fairfield, SRES or the other Loan Participations, including without limitation the 235 Wingate Loan, the Nine Mile Transaction, the Brantley Loan, and the C&R LOC, and blindly relied on the existing credit analysis provided by Fairfield, SRES or the other Security Bank Entities; and

d.   Despite consistent warnings from the GDBF and FDIC-C, Defendants allowed Security Bank of Bibb County to dramatically increase the high risk associated with ADC and CRE lending by allowing Fairfield or SRES to compensate loan officers primarily based on the volume of loans generated without regard to loan performance.

174.

Further, Defendants were aware, or in the exercise of even slight diligence should have been aware, of significant weaknesses in Security Bank of Bibb County's underwriting practices and procedures as described herein, as well as the risks and deterioration of Security Bank of Bibb County's loan portfolio, and did not address or correct these issues.

175.

As a direct and proximate result of the Defendants' grossly negligent actions and omissions as described herein, Security Bank of Bibb County suffered damage and sustained losses of at least $21.764 million or such other amount as may be proven at trial.

176.

With respect to their grossly negligent actions and inaction in managing the affairs of Security Bank, Defendants are jointly and severally liable for all losses.

## VI.   RELIEF REQUESTED

I.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the FDIC-R demands a trial by jury on all claims,

II.     On Counts 1-6, the FDIC requests judgment against all Defendants, jointly and severally, in sums to be proven at trial;

   A.   plus interest at the rate permitted by law which has accrued since August 13, 2010, or thirty (30) days from the date the FDIC-R made its demand for reimbursement against the Defendants pursuant to 12 U.S.C. § 1821(l) and O.C.G.A. § 51-12-4;

   B.   the costs of this action; and

   C.   for such other and further relief as the Court deems just and proper.

Respectfully submitted this   _____13th_____   day of September, 2013.

                                         _____/s/ Russell J. Rogers_____
                                         Michael V. Coleman
                                         Georgia Bar No. 177635
                                         Russell J. Rogers
                                         Georgia Bar No. 002278
                                         Anna M. Burns
                                         Georgia Bar No. 558234

**Thompson Hine LLP**
Two Alliance Center, Suite 1600
3560 Lenox Road
Atlanta, Georgia 30326
Telephone:  (404) 541-2900
Facsimile:  (404) 541-2905
Russell.Rogers@ThompsonHine.com
Anna.Burns@ThompsonHine.com

                                         *Attorneys for Federal Deposit Insurance Corporation as Receiver for Security Bank of Bibb County*